UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

CAMOFI MASTER LDC,                          :

                Plaintiff,      :          **OPINION**

       - against -              :          05 Civ. 6775 (DC)
                                                       05 Civ. 7710 (DC)
COLLEGE PARTNERSHIP, INC.,                   :          05 Civ. 9017 (DC)

   Defendant/Counterclaimant,        :

         - and -               :

BRIDGES & PIPES LLC and DUNCAN              :
CAPITAL LLC,
                                             :
   Third Party Defendants.

                  :

                  :

- - - - - - - - - - - - - - - - - -x

     AND RELATED CASES.                :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/28/06

**APPEARANCES:**   (See last page)

**CHIN, D.J.**

      These three related diversity cases arise out of a
failed financial arrangement pursuant to which College
Partnership, Inc. ("College Partnership"), a college preparation
company, engaged financial advisor and investment banking outfit
Duncan Capital LLC ("Duncan") to assist in College Partnership's
expansion.  Towards that end, Duncan arranged for two funds,
CAMOFI Master LDC ("CAMOFI") and Bridges & Pipes LLC ("Bridges"),
to each lend College Partnership $250,000.  Each loan was secured
by a promissory note executed by College Partnership (the
"Notes").

In these actions, CAMOFI and Bridges sue College Partnership to recover payment on the Notes.  In turn, College Partnership counterclaims against CAMOFI and Bridges to, <u>inter alia</u>, rescind the Notes on grounds of fraudulent inducement. College Partnership also asserts claims against Duncan for allegedly failing to perform services as promised under the terms of a financial advisory and investment banking agreement (the "Banking Agreement").

Before the Court are CAMOFI's and Bridges's summary judgment motions to recover on the Notes and motions to dismiss College Partnership's counterclaims.  Duncan has joined in the dismissal motions with respect to College Partnership's claims against it.

For the reasons set forth below, CAMOFI's and Bridges's motions for summary judgment and motions to dismiss are granted. Duncan's motion to dismiss is granted in part and denied in part.

**BACKGROUND**

**A.    The Parties**

College Partnership is incorporated in Nevada with its principal place of business in Colorado. (6/10/05 Compl. ¶ 1; 9/9/05 Countercl. ¶ 1; 10/19/05 Countercl. ¶ 1).  Its mission is to assist high school students from lower-income and middle-class families with college admissions and funding.  (Jones Decl. ¶ 1).

Duncan is a New York limited liability company ("LLC") with offices in Manhattan.  (9/9/05 Countercl. ¶ 2; 10/19/05 Countercl. ¶ 2).  CAMOFI, formerly known as DCOFI Master LDC, is

a "limited duration company" organized under the laws of the
Cayman Islands, with its principal place of business there as
well.[1]  (CAMOFI Compl. ¶ 2; 9/9/05 Countercl. ¶ 3; 10/19/05
Countercl. ¶¶ 3-4).  Bridges is a New York LLC, with its
principal place of business in New York, New York.  (Bridges
Compl. ¶ 2; 9/9/05 Countercl. ¶ 4).

**B.    The Facts**

        The facts, which are drawn both from the pleadings and
from the evidentiary materials in the record, are summarized
below.  As to the motions to dismiss College Partnership's
claims, the allegations set forth in its complaint,
counterclaims, and third party claims are assumed to be true.  As
to the motions for summary judgment on the Notes, the facts are
construed in the light most favorable to College Partnership, as
the party opposing the motions.

        **1.    Negotiation and Execution of the Banking Agreement**

        In early 2004, the husband and wife founders of College
Partnership, John Grace and Janice Jones, decided to seek outside
financing for the expansion of their company.  (Jones Decl. ¶¶ 1,
3).  Towards this end, they flew to New York in April 2004 to
meet with Richard Smithline and Michael Crow at Duncan's offices,

---

        [1]     For purposes of this action, any references in the
record or by the parties to "DCOFI Master LDC" or "DC Opportunity
Fund I," precursors to CAMOFI, are taken as a reference to
CAMOFI.  For clarity, the Court will substitute the name CAMOFI
for any references in the record to DCOFI Master LDC or DC
Opportunity Fund I.

located on the fourteenth floor of 830 Third Avenue, New York, New York.  (Id. ¶¶ 4-6 & Ex. J).

In the weeks that followed, these four individuals negotiated the terms of the Banking Agreement between College Partnership and Duncan.  (Id. ¶¶ 7-12 & Exs. A, B, & C).  Grace and Jones met at least one more time with Smithline at the Duncan offices in New York and once with Crow in Los Angeles to work out a deal.  (Id. ¶ 7).  In emails to Jones and Grace in April and May 2004, Smithline expressed eagerness to complete the deal with College Partnership.  (See id. Exs. B ("Let's not get bogged down here.") & J ("We would love the opportunity to partner with you and help take College Partnership to the next level.")).  These emails were sent from Smithline at his rs@duncancapital.net account and with the company name "Duncan Capital Group LLC" accompanying his signature.  (Id.).  Smithline claims he met with Jones and Grace in his capacity as Director of CAMOFI. (Smithline Aff. ¶¶ 1-2).

On May 27, 2004, Grace, as Chief Financial Officer of College Partnership, and Bradford E. Monks, as General Counsel/ Senior Vice President of Duncan Capital, executed the Banking Agreement.  (Jones Decl. ¶ 12 & Ex. C).  By its terms, College Partnership engaged Duncan as its "exclusive advisor for . . . financial advisory, investment banking and related transactions." (Id. Ex. C at 1).  Duncan agreed to

> (i) identify on a "best efforts" basis
> funding sources and secure financing for
> [College Partnership] through a private
> placement of equity and/or debt in one or

> more transactions between [College
> Partnership] and one or more investors and/or
> lenders . . . (the "Financing"), and
>
> (ii) use commercially reasonable efforts to
> arrange an "accounts receivable" line (the
> "A/R Facility") with a third party . . . .
> Duncan also will seek to arrange a bridge
> financing for [College Partnership], the
> terms of which will be set forth in
> separately executed definitive documentation
> (the "Bridge Financing").  As compensation
> for services rendered in connection with
> arranging the Bridge Financing, upon receipt
> by [College Partnership] of gross proceeds of
> not less than $500,000 pursuant to the Bridge
> Financing, [College Partnership] will issue
> 250,000 shares of [College Partnership]'s
> restricted Common Stock as directed by Duncan
> or its affiliate and provide certain
> registration rights with respect to such
> shares of Common Stock.

(Id. Ex. C § 1).

  In sum, on behalf of College Partnership, Duncan was

to: (1) secure financing and funding sources, (2) arrange an

accounts receivable line of credit (the "A/R Facility"), and (3)

arrange bridge financing of $500,000.  In return for the bridge

financing, College Partnership was to issue 250,000 shares of

company stock, with registration rights, to Duncan "or its

affiliate."  (Id.).

  With respect to the financing and A/R Facility, the

Banking Agreement also implemented a detailed fee structure to

compensate Duncan for services rendered to College Partnership.

(Id. Ex. C § 4).  As exclusive advisor, Duncan would have the

right of first refusal with respect to any financial transactions

or advice sought by College Partnership.  (Id. ¶ 13 & Ex. C § 9).

The timeline for financing "contemplated that the Bridge

Financing will close on or prior to June 7, 2004, and that,
within thirty . . . or sixty . . . days following the closing of
the Bridge Financing, [College Partnership] will pursue a
Financing." (Id. Ex. C § 1).

### 2. __The $500,000 Bridge Financing and Promissory Notes__

The $500,000 in bridge financing came through two weeks
later in the form of a $250,000 loan from CAMOFI and a $250,000
loan from Bridges.  On June 15, 2004, Grace, acting on behalf of
College Partnership, signed and delivered the two Notes, for
$250,000 each -- one to CAMOFI (the "CAMOFI Note") and one to
Bridges (the "Bridges Note").  (Smithline Aff. ¶ 4; 11/16/05
Fuchs Aff. ¶ 8; Jones Decl. Exs. D & E).

That same day, Grace also executed a Security Agreement
on behalf of College Partnership, designating College
Partnership's personal property and assets as collateral.  (Jones
Decl. Ex. F §§ 1(a), 4, 6, 8; 11/16/05 Fuchs Aff. ¶ 9).  Listed
as Secured Parties were Bridges and DCOFI Master LDC (now known
as CAMOFI).  As managing members, David Fuchs signed the Security
Agreement for Bridges and Smithline signed for DCOFI Master LDC.
Both Bridges and DCOFI Master LDC provided 830 Third Avenue, 14th
Floor, New York, New York, as their address.  (Jones Decl. Ex.
F).

### 3. __College Partnership's Performance on the Notes__

#### a. __Payments of Interest and Principal__

With the exception that one Note is payable to CAMOFI
and the other to Bridges, the Notes are identical.  They each

provide for College Partnership to repay the principal of $250,000 with interest at 10% per annum.  College Partnership was to make quarterly interest payments to CAMOFI and Bridges (on September 15, 2004, December 15, 2004, and March 15, 2005), with full payment of the principal and unpaid interest due on June 15, 2005.  (Id. Exs. D §§ 1-2 & E §§ 1-2; Smithline Aff. ¶¶ 5-6; 11/16/05 Fuchs Aff. ¶¶ 8-9).  Failure to make any interim interest payments gave CAMOFI and Bridges the right to demand full payment on their respective notes.  (Jones Decl. Exs. D § 8, E § 8, & F § 6.1).  Default on June 15, 2005, would trigger a late fee -- an increase in interest rate from 10% to 20% per annum.  (Id. Exs. D § 1(b) & E § 1(b); Smithline Aff. ¶ 8).

College Partnership made quarterly interest payments to CAMOFI through March 15, 2005, but ceased further payment after that date.  (Jones Decl. ¶ 23 & Ex. K; Smithline Aff. ¶ 5).  On June 15, 2005, College Partnership did not pay the principal of $250,000 or the remaining interest, prompting CAMOFI's counsel to send College Partnership a letter on July 18, 2005, demanding immediate payment of the principal, as well as the unpaid interest, liquidated damages, and attorneys' fees.  (Smithline Aff. ¶ 7 & Ex. B).

College Partnership failed to make any quarterly interest payments to Bridges or repay the principal amount of the $250,000 loan on June 15, 2005.  (11/16/05 Fuchs Aff. ¶¶ 10, 23; Jones Decl. ¶¶ 19, 23).  Bridges demanded payment of all principal, interest, liquidated damages, and attorneys' fees in a

letter from its counsel dated August 12, 2005.  (11/16/05 Fuchs
Aff. ¶ 22 & Ex. D).

####    b.    Registration Obligations

By the terms of the Banking Agreement, Duncan's fee for
providing bridge financing was 250,000 shares in College
Partnership common stock, which Duncan chose to have registered
to CAMOFI and Bridges -- 125,000 shares to each.  (Jones Decl. ¶
16 & Exs. C § 1, H, & I).  Upon CAMOFI's and Bridges's demand,
College Partnership was to file a Registration Statement with the
Securities and Exchange Commission ("SEC") within 120 days of the
issuance of the Notes (October 13, 2004).  (Id. Exs. D § 3(f) & E
§ 3(f)).  Failure to timely file the Registration Statement would
trigger "Filing Default" liquidated damages every thirty days in
the amount of 1% of the outstanding principal.  (Id. Exs. D §
3(f)(ii) & E § 3(f)(ii)).  If the Registration Statement was not
declared "effective" within 150 days following the Notes'
issuance (November 12, 2004), then College Partnership would have
to pay additional liquidated damages for the Effectiveness
Default, also at thirty-day intervals.  (Id. Exs. D § 3(f)(iii) &
E § 3(f)(iii)).

On November 17, 2004, Crow sent a letter to inform
Grace of College Partnership's default on its registration
obligations "[i]n connection with the investment of $500,000 by
[CAMOFI] and Bridges [ ] ('the Funds')."  (Smith Decl. Ex. B;
11/16/05 Fuchs Aff. ¶ 19).  Crow demanded $5,000 in liquidated
damages for the filing default and gave notice of its intention

to pursue effectiveness default damages as well.  (Smith Decl. Ex. B).  College Partnership paid CAMOFI -- but not Bridges -- liquidated damages of $7,500 for the Filing Default and $5,000 for the Effectiveness Default through January 11, 2004. (11/16/05 Fuchs Aff. ¶¶ 20, 21, 23; Smithline Aff. ¶¶ 12, 14; Jones Decl. Ex. K).  Thereafter, College Partnership made no further liquidated damages payments to either CAMOFI or Bridges in connection with its registration obligations.[2]

Attached to the November 17, 2004 letter was a "Deal Amendment Proposal" that represented the "collective position" of Bridges, CAMOFI, and Duncan with respect to College Partnership's obligations under the Banking Agreement and the Notes.  The proposal was purportedly in response to Grace's request for a waiver of the defaults and restructuring of the obligations, but it does not appear that College Partnership ever accepted or agreed to the amendments.  (Smith Decl. Ex. B).

### 4.   **Performance on the Banking Agreement**

While Duncan met its obligation to arrange bridge financing, it failed to provide the low-interest A/R Facility or permanent financing as described in the Banking Agreement. (Jones Decl. ¶ 20).  Duncan also failed to provide funding for an infomercial, a term that was not included within the Banking Agreement, but Jones contends had been part of the negotiations.

---

[2]     The liquidated damage payments appear to be marked by handwritten designation as "Penalty," but there is one payment of $2,500 on November 22, 2004, labeled "Interest," that also appears to be for liquidated damages.  (Jones Decl. Ex. K).

(<u>Id.</u> ¶ 20 & Ex. A).  Jones and Grace complained to Duncan in late 2004, but received an evasive and defensive response.  Smithline, in September 2004, told them that arranging lines of credit "wasn't [Duncan's] business."  In October 2004, Smithline threatened to "ruin" College Partnership.  (<u>Id.</u> ¶ 22).

Without permanent financing, College Partnership could not repay the bridge financing and corresponding penalties.  It also remained bound to a high rate A/R facility.  Because it was locked up to Duncan as its exclusive financial advisor, College Partnership could not seek alternative funding and was blocked from capitalizing on the expanding market.  College Partnership suffered negative revenues in 2004 and projected losses in the millions in 2005.  (<u>Id.</u> ¶¶ 19, 23).

## C.   **Prior Proceedings**

The prior proceedings are somewhat convoluted, involving three separate cases, the same four parties, and overlapping claims.

### 1.   **Colorado Proceedings**

On June 10, 2005, days before payment of the principal on the Notes was due, College Partnership filed suit against Duncan, CAMOFI, and Bridges in the Colorado State District Court. College Partnership sought three forms of relief: (1) a declaratory judgment that Duncan had not met its obligations under the Banking Agreement; (2) damages based on Duncan's alleged breach of the Banking Agreement; and (3) rescission and/or reformation of the Banking Agreement and both Notes, as

well as cancellation of the shares of common stock, on grounds of fraudulent inducement.

The defendants removed the case on the basis of diversity jurisdiction to the Colorado federal district court on July 15, 2005.  They then moved to dismiss the complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and/or to transfer venue to this Court.

In an order dated October 12, 2005 (the "10/12/05 Order"), Judge Richard P. Matsch dismissed all of the claims against CAMOFI and Bridges for failure to state a claim, but also noted that College Partnership's "contentions . . . concerning the circumstances giv[ing] rise to the issuance of those notes would be defenses in [the actions pending in the Southern District of New York]." (10/12/05 Order at 2).  Judge Matsch also dismissed the rescission and reformation claim against Duncan for failure to comply with the strict pleading requirements for fraud.  (Id.).  He then transferred the remaining two claims against Duncan (for declaratory judgment and for breach of contract damages) to this Court to honor a New York forum selection clause in the Banking Agreement and "serve[] the interest of judicial economy," as, by that time, two related cases had been filed before this Court by CAMOFI and Bridges. (Id. at 2-3; see Jones Decl. Ex. C § 10).

College Partnership appealed the 10/12/05 Order to the Tenth Circuit.  On April 4, 2006, after these motions were fully submitted, the Tenth Circuit dismissed the appeal; the court

determined that it lacked appellate jurisdiction because the
10/12/05 Order was "not final" and "not an appealable
interlocutory or collateral order."  Coll. P'ship Inc. v. Duncan
Capital, LLC, No. 05-1508 (10th Cir. Apr. 4, 2006).

    2.  **Southern District of New York**

        a.  **The Complaints, Counterclaims,
and Third Party Complaints**

On July 28, 2005, while the action in Colorado was
still pending, CAMOFI filed a complaint against College
Partnership in this Court to recover payments of interest and
principal, liquidated damages, and attorneys' fees on the CAMOFI
Note.  Then, on September 1, 2005, Bridges filed a similar action
against College Partnership to recover on the Bridges Note and
enforce the Security Agreement entitling Bridges to possession of
College Partnership's collateral.

In nearly identical answers to both complaints, College
Partnership alleged a whole slew of affirmative defenses to
enforcement of the notes -- nineteen in all -- including
fraudulent inducement.  College Partnership also raised the same
four claims against CAMOFI, Bridges, and Duncan (in the form of
compulsory counterclaims against CAMOFI and Bridges and third
party complaints against Duncan), largely reiterating the claims
in the Colorado action.

        b.  **The Instant Motions**

Before the Court are a number of overlapping motions:
CAMOFI moves for summary judgment to enforce the CAMOFI Note, and
Bridges moves for summary judgment to enforce the Bridges Note

and the Security Agreement.

CAMOFI, Bridges, and Duncan move to dismiss College Partnership's counterclaims and third party complaints pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Duncan also moves to dismiss the complaint transferred from the District of Colorado on the same grounds.[3]

## DISCUSSION

I first address the summary judgment motions.  Then I discuss the motions to dismiss.

### A.    Summary Judgment Motions

CAMOFI and Bridges each seek to recover repayment of the principal, plus interest, liquidated damages, and attorneys' fees on their $250,000 Notes.  To win summary judgment, CAMOFI and Bridges must establish a right to recovery based on breach of the Notes.  To defeat summary judgment, College Partnership must show the existence of a genuine issue of material fact with respect to a bona fide defense to payment.  I first address whether CAMOFI and Bridges have established a right to recovery, and I then discuss whether College Partnership has presented triable issues of fact as to any bona fide defense.

---

[3]     By order dated December 9, 2005, this Court deemed Duncan's motion to dismiss the third party complaint in the action filed by Bridges to also constitute a motion to dismiss the Colorado-filed complaint.

1.   **Breach of Promissory Notes**

   a.   **Applicable Law**

Actions for recovery on a promissory note are appropriately decided by motion for summary judgment.  <u>Eisenstein v. Kelly Music & Entm't Corp.</u>, No. 97 Civ. 4649 (DC), 1998 WL 289734, at *4 (S.D.N.Y. June 4, 1998) (citations omitted).  A promissory note stands on its own and establishes the plaintiff's right to payment.  To make out a <u>prima facie</u> case for recovery, "a plaintiff must simply show proof of a note and failure to make payment."  <u>Id.</u> (internal citations and quotation marks omitted).  When a note holder has established a <u>prima facie</u> claim, the burden shifts to the defendant to prove the "'existence of a triable issue of fact in the form of a bona fide defense against the note.'"  <u>Nat'l Union Fire Ins. Co. v. Keenan</u>, No. 93 Civ. 6784 (LLS), 2005 WL 736233, at *1 (S.D.N.Y. Mar. 31, 2005) (quoting <u>Couch White L.L.P. v. Kelly</u>, 729 N.Y.S.2d 206, 207 (3d Dep't 2001)).

   b.   **Application**

Here, both CAMOFI and Bridges have satisfied their burden of production.  It is undisputed that College Partnership executed and delivered the CAMOFI Note and Bridges Note in the amounts of $250,000 each.  College Partnership admits that it failed to make any payments on the Bridges Note and made only partial payment on the CAMOFI Note (although the exact sums may be disputed).  As a reasonable jury could only conclude, both CAMOFI and Bridges have established <u>prima facie</u> claims for

recovery on their respective Notes.  Hence, the burden shifts to College Partnership to present evidence from which a reasonable jury could find a bona fide defense to payment.

    **2.**   **College Partnership's Defense**

To establish a bona fide defense, the defendant may not rely on conclusory allegations, but instead must show by admissible evidence "a genuine and substantial issue rebutting holder's entitlement to payment."  Internet Law Library, Inc. v. Southridge Capital Mgmt., No. 01 Civ. 6600 (RLC), 2005 WL 3370542, at *7 (S.D.N.Y. Dec. 12, 2005) (internal citation and quotation omitted).  Where there is a lack of evidence supporting an essential element of a defense, there can be no genuine issue of material fact preventing a grant of summary judgment.  Woo v. Times Enter., Inc., No. 98 Civ. 9171 (SAS), 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000) (citation omitted).  A "stringent standard" applies to evaluating a defense to a negotiable instrument among "sophisticated business people."  Citicorp Int'l Trading Co. v. W. Oil & Refining Co., 790 F. Supp. 428, 434 (S.D.N.Y. 1992) (citing Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 95 (1985)).

In its opposition papers, College Partnership only pursues one affirmative defense: fraudulent inducement by CAMOFI's and Bridges's alleged alter ego, Duncan.  College Partnership argues as follows: Duncan, CAMOFI, and Bridges are alter egos of a single entity.  Smithline and Crow, acting on behalf of this entity, misrepresented Duncan's intention to

perform the Banking Agreement, when in fact Duncan had no such intention.  College Partnership executed the Notes and incurred the corresponding $500,000 debt in reasonable reliance on Smithline's and Crow's misrepresentations that Duncan would fulfill the terms of the Banking Agreement.  In so doing, they knowingly and intentionally induced College Partnership to enter into the Notes and Security Agreement (as well as the Banking Agreement) as part of a single multi-step transaction.  Had it been aware of these misrepresentations, College Partnership would not have executed the Notes.

This theory rests upon College Partnership's ability to establish a genuine issue of material fact as to whether CAMOFI and Bridges were merely Duncan's alter egos.  Even if such an alter ego relationship might reasonably have existed, College Partnership must also establish fraudulent inducement with respect to the Notes.

### a.   <u>CAMOFI and Bridges as Duncan's Alter Egos</u>

#### i)   <u>Applicable Law</u>

A defense of fraudulent inducement cannot be maintained where the fraud was not committed by the note holder but by a third party instead.  See <u>Richmond Plaza Assocs. v. Santucci</u>, 596 N.Y.S.2d 379, 379 (1st Dep't 1993) (rejecting fraudulent inducement defense to enforcement of promissory notes where fraud was committed by defendant's investment advisor -- not the note holder); <u>see also</u> <u>Thornock v. Kinderhill Corp.</u>, 749 F. Supp. 513, 518 (S.D.N.Y. 1990) (noting that third party fraud is a defense

to the note only where third party was the note holder at some time).  Consequently, College Partnership's claim that execution of the Notes was fraudulently obtained can only prevail if it can establish that Duncan is not an unrelated third party but, rather, controls CAMOFI and Bridges as alter egos.

To establish that the two Note holders were Duncan's alter egos, College Partnership must show complete control by Duncan, as the dominating entity, and use of that control to commit a fraud.  See Heitz v. Salant Corp., No. 95 Civ. 3866 (DC), 1997 WL 13241, at *4 (S.D.N.Y. Jan. 15, 1997).  The alter ego determination must be made in view of "the totality of the facts."  United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000) (internal citation and quotation marks omitted).  Courts may consider, inter alia, the following factors:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence . . . (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,
933 F.2d 131, 139 (2d Cir. 1991).

### ii) **Application**

College Partnership adduces ample evidence to support
factors 4 and 5 (overlapping personnel and shared office space
among CAMOFI, Bridges, and Duncan).  While Smithline avers that
he is a Director of CAMOFI, and only negotiated the terms of the
Note in his capacity as a CAMOFI officer (Smithline Aff. ¶ 1),
Jones maintains that over the course of negotiations in April and
May 2004, neither Smithline nor Crow ever purported to speak on
behalf of CAMOFI or Bridges.  During that time, she claims that
she was led to believe that Smithline and Crow were principals of
Duncan who were negotiating on Duncan's behalf.  (Jones Decl ¶¶
14-15, 17).  Evidence exists showing this belief was reasonable.

In April and May 2004, Smithline sent email messages to
Jones and Grace from his rs@duncancapital.net address, with a
signature that identified him as a representative of "Duncan
Capital Group LLC" at 830 Third Avenue, 14th Floor, New York, New
York.  (Id. ¶ 17 & Exs. B & J).  In November 2004, Crow wrote to
Grace, on Duncan letterhead, demanding liquidated damages
pursuant to the registration obligations for both CAMOFI and
Bridges, but signing as Manager of Bridges.  (Smith Decl. Ex. B).
Various SEC filings show that Duncan, Bridges, and CAMOFI were
affiliates of one another, and Smithline was an assignee of
Duncan's shares of common stock in connection with a different
investment banking agreement.  (Id. Exs. F, G, H, & I).

- 18 -

On the Duncan website, Crow is profiled as co-manager of Bridges, Chairman and Chief Executive Officer of Duncan, and co-founder of the DC Opportunity Fund (the precursor to CAMOFI). (Id. Ex. E).  A November 2004 SEC filing lists Crow as President and Chief Executive Officer of Duncan, as well as a manager of Bridges along with David Fuchs, while an April 2005 SEC filing describes Fuchs as having sole dispositive voting power in Duncan and, as Managing Director, shared dispositive voting power with Crow in Bridges.  (Id. Exs. H & I).  Moreover, Fuchs attests to his position as a Managing Director of Bridges and Duncan, both of which are small companies, with two employees and one employee respectively.  (11/16/05 Fuchs Aff. ¶ 1; 7/21/05 Fuchs Aff. ¶ 17; see also Smith Decl. Ex. F).  Thus, there is considerable overlap in personnel and management among the three companies.

Additionally, a reasonable juror could find that CAMOFI, Bridges, and Duncan shared office space.  After executing the Notes, College Partnership received an email from Smithline's assistant that CAMOFI's office was in the Cayman Islands, but requesting that all mail for CAMOFI be forwarded to Smithline's attention at Duncan Capital LLC, 830 Third Avenue, New York, New York.  (Jones Decl. ¶ 15 & Ex. G).  By the terms of both Notes, any communications were to be sent to the payees (CAMOFI or Bridges) at "Duncan Capital" at the 830 Third Avenue address. (Id. Exs. D § 15 & E § 15).  Likewise, the addresses for CAMOFI and Bridges on the Security Agreement were also listed as the 830 Third Avenue offices of Duncan.  (Id. Ex. F).  Finally, SEC

filings provided the 830 Third Avenue address as the principal business office of Smithline, Crow, Fuchs, Duncan, Bridges, and DCOFI Master LDC (or CAMOFI).  (Smith Decl. Exs. I, Item 2 & J, Item 2).

   With respect to the independence of CAMOFI and Bridges from Duncan (factors 6, 7, and 8), College Partnership contends that the funds CAMOFI and Bridges were mere "investment vehicles managed and controlled by Duncan" and submitted some supporting evidence.  (College Partnership ("CP") Opp. Mem. at 9).  Prior to being presented with the Notes in June 2004, Jones never heard of either fund throughout negotiations with Smithline and Crow. (Jones Decl. ¶ 14 & Exs. D, E, & F).  Smithline told her that the two funds were introduced to the deal to provide bridge financing from offshore accounts, while at the same time representing that he and Crow were "the committee to fund." (Id. ¶¶ 15, 17, & Ex. B).  Based on Smithline's representations, Jones believed that Duncan, CAMOFI, and Bridges were all part of a single entity, for which CAMOFI and Bridges existed merely to provide financing.

   The Security Agreement was signed by Smithline for CAMOFI and by Fuchs for Bridges; both men also had authority to represent Duncan as detailed above.  (Id. Ex. F).  A 2004 investment newsletter explained that CAMOFI was launched by Duncan as its first private investment fund and would be managed by DC Asset Management -- a Duncan subsidiary of which Smithline was president.  (Smith Decl. Exs. C at 5 & D).  Also, Crow wrote to demand registration and liquidated damages for both CAMOFI and

Bridges and discussed the Notes as a single "investment of $500,000" by the two funds, as opposed to two separate loans. (Id. Ex. B).  Moreover, by terms of the Banking Agreement, Duncan chose to assign its rights in the 250,000 shares of College Partnership to CAMOFI and Bridges as its "affiliates."  (Jones Decl. ¶ 16 & Exs. H & I).  Hence, a reasonable juror could find that rather than operating as independent profit centers at arms length from Duncan, the two funds operated as subsidiaries of Duncan.

On the other hand, College Partnership fails to submit any evidence as to whether CAMOFI or Bridges conducts financing on behalf of entities aside from Duncan, whether the businesses are adequately capitalized, and whether corporate formalities are maintained.  The three companies are separately incorporated, and Bridges apparently maintains some independent assets, for the SEC filings show that Duncan and Bridges held stocks separately. (See, e.g., Smith Decl. Ex. I, Item 4).  At the same time, CAMOFI, Bridges, and Duncan also do not submit any evidence to show that CAMOFI or Bridges provide funding for any investment advisor other than Duncan or otherwise serve a purpose separate and distinct from conducting Duncan's business.  See Citicorp Int'l, 790 F. Supp. at 438.

The determination of alter ego status is a factual one.  See NLRB v. County Van & Storage Inc., No. 97 Civ. 2099 (JSM), 1997 WL 282212, at *4 (S.D.N.Y. May 28, 1997) (citations omitted).  On the record before the Court, reasonable jurors

- 21 -

could draw differing conclusions as to whether CAMOFI and Bridges were alter egos of Duncan.  Hence, summary judgment on this issue is not appropriate.

### b.   **Fraudulent Inducement Defense**

#### i)   **Applicable Law**

Both the CAMOFI Note and the Bridges Note expressly provide that they are governed by New York law.  To establish a valid defense of fraudulent inducement, College Partnership must establish: (1) a misrepresentation of an existing material fact; (2) made with knowledge of its falsity; and (3) with an intent to defraud; (4) that induces reasonable reliance; and (5) damages the defendant.  See Stumm v. Drive Entm't, Inc., No. 00 Civ. 4676 (DC), 2002 WL 5589, at *7 (S.D.N.Y. Jan. 2, 2002) (citations omitted); see also Woo, 2000 WL 297114, at *4 (providing elements of fraudulent inducement defense).  To be considered material, misrepresentations must relate to the terms or conditions of the loan itself.  Thornock, 749 F. Supp. at 518.

Fraud in the inducement cannot be based on a "mere unfulfilled promissory statement"; a party must show that the promisor had a "preconceived and undisclosed intention that the promise will not be performed," Von Hoffmann v. Prudential Ins. Co. of Am., 202 F. Supp. 2d 252, 259 (S.D.N.Y. 2002) (internal citation and quotation marks omitted), and adduce facts "above and beyond mere non-performance," Computech Int'l, Inc. v. Compaq Computer Corp., No. 02 Civ. 2628 (RWS), 2004 WL 1126320, at *8 (S.D.N.Y. May 21, 2004) (citation omitted).  College Partnership

"must proffer enough proof to allow a reasonable jury to find"
each element of the defense "by clear and convincing evidence."
Woo, 2000 WL 297114, at *4 (internal citation and quotation marks
omitted).

### ii)  **Application**

Here, the misrepresentations College Partnership
attributes to Duncan concern Duncan's intentions to perform
services under the Banking Agreement.  In essence, College
Partnership seeks to use Duncan's purported breach of the Banking
Agreement as a defense against its obligations under the Notes
and Security Agreement.  This defense fails because a reasonable
juror could only conclude that the Banking Agreement is a
distinct contract from the Notes.  Even assuming that Duncan,
CAMOFI, and Bridges operate as a single entity, that does not
undermine the conclusion that the Banking Agreement and Notes are
separate contracts, with clear and unambiguous language to that
effect.  See Tecnoclima, S.p.A. v. PJC Group of N.Y., Inc., No.
89 Civ. 4437 (CSH), 1991 WL 33357, at *9 (S.D.N.Y. Feb. 27,
1991).  Any misrepresentation Duncan purportedly made was with
respect to the Banking Agreement and did not relate to the terms
of the Notes.

College Partnership claims that "the notes do not stand
alone" but "form part of a larger transaction between Duncan [ ]
and College Partnership."  (CP Opp. Mem. at 18).  In support,
College Partnership submits affidavits from Jones, founder and
corporate secretary, and its counsel, Turner Smith, with various

- 23 -

exhibits.[4]  College Partnership relies heavily upon an unsigned
and undated Draft Term Sheet prepared by Duncan that preceded the
Banking Agreement to argue that the bridge financing was a
condition precedent to Duncan's engagement as exclusive financial
advisor.  (Id. at 9; Jones Decl. Ex. A).  The Draft Term Sheet
states that "[u]pon the Closing of the bridge financing, [College
Partnership] shall enter into an engagement letter . . . with
Duncan, providing that Duncan shall serve as [College
Partnership]'s exclusive advisor in financial advisory,
investment banking and related transactions . . . ."  (Jones
Decl. Ex. A at 3).  Hence, College Partnership contends, the
Notes and Banking Agreement were to be executed simultaneously
(although they were actually executed weeks apart) and should be
considered part of a single, overarching contract.  (CP Opp. Mem.
at 8-9).  See Westbury Small Bus. Corp. v. Ballarine, 489
N.Y.S.2d 815, 823-24 (N.Y. Sup. Ct. 1985) (finding promissory
note and other simultaneously executed contracts all "part of one
single transaction"), aff'd 509 N.Y.S.2d 569 (2d Dep't 1986).

        To determine whether simultaneously executed
instruments are a single contract or separate agreements, the
intention of the parties must be determined from reading the
various instruments and examining the facts and circumstances at

---

        [4]     The parol evidence rule does not bar consideration of
such extrinsic evidence of fraudulent inducement, provided that
the contract does not contain a disclaimer of the specific
misrepresentations at issue.  See Internet Law Library, Inc. v.
Southridge Capital Mgmt., No. 01 Civ. 6600 (RLC), 2005 WL
3370542, at *4 (S.D.N.Y. Dec. 12, 2005); Sabo v. Delman, 3 N.Y.2d
155, 161-62 (1957).

the time of execution.  <u>Sample v. Gotham Football Club, Inc.</u>, 59
F.R.D. 160, 164 (S.D.N.Y. 1973).  Rather than being executed
simultaneously, the Notes and Banking Agreement were completed at
different times, and signed by different people and parties.  The
Banking Agreement was signed by Bradford E. Monks for Duncan and
Grace for College Partnership on May 27, 2004, while the Notes
were executed more than two weeks later, on June 15, 2004.  Grace
executed both the Notes and the Security Agreement for College
Partnership; Fuchs executed the Security Agreement for Bridges;
and Smithline executed the Security Agreement for CAMOFI.

Neither the Notes nor the Banking Agreement
incorporates the terms of the other by reference.  To the
contrary, the Banking Agreement makes clear that it is a distinct
instrument from the Notes.  The Banking Agreement specifically
provides that "Duncan . . . will seek to arrange a bridge
financing for [College Partnership], the terms of which will be
set forth in <u>separately</u> <u>executed</u> definitive documentation."
(Jones Decl. Ex. C § 1) (emphasis added).  <u>See</u> <u>Corvetti v.</u>
<u>Hudson</u>, 676 N.Y.S.2d 263, 265 (3d Dep't 1998) (finding that an
alleged breach of a related but independent agreement will not
defeat a motion for summary judgment unless the agreements are
sufficiently intertwined).  The Notes do not at all refer to
Duncan or the Banking Agreement.  In contrast, they do reference
the Security Agreement being executed "simultaneously" to secure
payment of the obligation on the Notes.  (Jones Decl. Exs. D at 1
& E at 1).

Moreover, because the Banking Agreement was signed two weeks prior to the Notes, College Partnership's contention that the bridge financing was a condition precedent to Duncan's engagement fails.  The clear language of the Notes do not condition repayment upon any act by Duncan.  Instead, the terms of the Notes explicitly require repayment of the entire balance on June 15, 2005, without qualification.  (Id. Exs. D § 1(a) & E § 1(a)).  Under the Security Agreement, College Partnership, as debtor, "secure[d] payment and performance of all debts, loans and liabilities . . . to Secured Parties [CAMOFI and Bridges] arising under the Notes."  (Id. Ex. F § 2).

College Partnership's fraud defense also fails because it is not based on a misrepresentation of existing fact.  College Partnership asserts that it was fraudulently induced into executing the Notes by oral and written representations (in the Banking Agreement) concerning future financing and other financial services Duncan would perform.  Cf. Newcourt Small Bus. Lending Corp. v. Grillers Casual Dining Group Inc., 727 N.Y.S.2d 699, 701 (3d Dep't 2001) (upholding grant of summary judgment on payment of promissory note and rejecting fraud defense based on conclusory allegations that note holder had falsely promised to secure future loans for defendant).  But College Partnership has failed to present evidence from which a reasonable jury could find that at the time Duncan entered into the Banking Agreement, it bore no intention to honor the terms.  See id.; J.L.B. Equities, Inc. v. Mind Over Money, Ltd., 691 N.Y.S.2d 65, 66 (2d

Dep't 1999).  Indeed, Duncan's partial performance under the
Banking Agreement by arranging for the $500,000 bridge financing
undermines a finding that it had any "preconceived and
undisclosed intention" not to perform.  Von Hoffmann v.
Prudential Ins. Co. of Am., 202 F. Supp. 2d 252, 259 (S.D.N.Y.
2002).

Moreover, College Partnership's conduct with regard to
the Notes also does not support a finding that it had been
fraudulently induced to execute them.  As of November 2004,
College Partnership appeared to request a restructuring of its
obligations under the Notes and Banking Agreement (Smith Decl.
Ex. B), and as late as March 2005, College Partnership was still
making payments on the CAMOFI Note (Jones Decl. Ex. K).
Accordingly, College Partnership's allegations are merely
conclusory, unsupported by clear and convincing evidence by which
a reasonable jury could find fraud.  See Marks v. Carrier, No. 90
Civ. 6714 (MBM), 1992 WL 245684, at *3 (S.D.N.Y. Sept. 21, 1992)
(finding defendant failed to produce any evidence of being
fraudulently induced to execute notes by plaintiff's
representations that notes were for investments instead of
loans).

In sum, College Partnership's fraudulent inducement
defense amounts to nothing more than a breach of contract claim
against Duncan for alleged failures to fully perform the Banking
Agreement.  It is well-established under New York law that "a
fraud claim arising directly from the contractual relationship of

the parties cannot be asserted simply by inclusion of the allegation that the defendant falsely promised to comply with its obligations under the contract."  <u>Stumm</u>, 2002 WL 5589, at *7 (internal citation and quotation marks omitted).

While College Partnership's fraud defense is invalid for the reasons described above, it is worth noting that it also fails because the plaintiff specifically waived his right to protest payment of the Notes.  By the terms of the Notes, College Partnership pledged that "[e]ach payment of principal and of interest shall be paid . . . without setoff or counterclaim." (Jones Decl. Exs. D § 1(d) & E § 1(d)).  "Under New York law, such a waiver among sophisticated parties is effective to overcome virtually any defense to enforcement."  <u>Internet Law Library</u>, 2005 WL 3370542, at *7 (examining nearly identical waiver).

No jury could reasonably find that CAMOFI and Bridges fraudulently induced College Partnership to execute the Notes. Accordingly, their motions for summary judgment are granted.

**B.   <u>Motions to Dismiss</u>**

College Partnership brings four claims against Duncan, CAMOFI, and Bridges seeking: (1) monetary damages based on Duncan's alleged breach of contract; (2) a declaratory judgment that Duncan breached the Banking Agreement; (3) rescission and/or reformation of the Banking Agreement, Notes, and issuance of stock based on fraudulent inducement; and (4) contribution and/or indemnification from Duncan for any damages recovered by

CAMOFI or Bridges under the Notes.[5]  Defendants move to dismiss all four claims.  I address each claim in turn.

### 1.    **Breach of Contract**

To state a claim for breach of contract under New York law, a party must allege (1) the existence of an agreement, (2) performance of the contract by plaintiff, (3) breach of the agreement by defendant, and (4) damages from the breach.  See Bridgeway Corp. v. Citibank, N.A., 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001).

#### a.    **Duncan**

College Partnership alleges that (1) it entered into the Banking Agreement with Duncan; (2) it performed by paying Duncan fees and providing Duncan's affiliates 250,000 shares of common stock; (3) Duncan breached the Banking Agreement by, inter alia, failing to use "best efforts" and "commercially reasonable methods" to arrange financing; and (4) College Partnership was damaged as a result.  Hence, it would appear that College Partnership adequately states a breach of contract claim.

Duncan argues, however, that this claim should nonetheless be dismissed as it is barred by a clause in the Banking Agreement that provides:

---

[5]    All three cases contain almost exactly the same claims by College Partnership, except that the fourth cause of action for contribution and/or indemnification was not raised in the Colorado action.  Judge Matsch in the District of Colorado dismissed the claims against CAMOFI and Bridges.  CAMOFI argues that decision should be given res judicata effect.  Because, in any event, these claims against CAMOFI and Bridges fail, I do not discuss the res judicata implications of Judge Matsch's order.

> Neither Duncan nor any of its affiliates . .
> . shall be liable . . . for any claim, loss,
> damage, liability, cost or expense suffered
> by [College Partnership] . . . arising out of
> or related to Duncan's Engagement . . .
> except for a claim . . . that arises solely
> out of or is based solely upon any action or
> failure to act by Duncan . . . that is found
> in a final judicial determination to
> constitute bad faith, willful misconduct or
> gross negligence on the part of Duncan.

(Jones Decl. Ex. C § 6).  The New York State Court of Appeals

recognizes that courts should normally honor liability limiting

provisions.  Met. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84

N.Y.2d 430, 436 (1994) (finding such a provision "represents the

parties' Agreement on the allocation of the risk of economic loss

in the event" of non-performance).  The parties "may later regret

their assumption of the risks of non-performance in this manner,

but the courts let them lie on the bed they made," id. (internal

citation and quotation marks omitted), unless the provision is

"the result of unconscionable conduct or unequal bargaining power

between the parties," DynCorp v. GTE Corp., 215 F. Supp. 2d 308,

317 (S.D.N.Y. 2002).

Here, the exculpatory provision expressly does not

apply where there has been "bad faith, willful misconduct or

gross negligence" by Duncan.  (Jones Decl. Ex. C § 6).  Such

determinations generally present factual questions inappropriate

for resolution on a motion to dismiss.  See Pinto v. Allstate

Ins. Co., 221 F.3d 394, 400 (2d Cir. 2000) (finding bad faith

analysis presented a question of fact); Quickie, LLC. v.

Medtronic, Inc., No. 02 Civ. 1157 (GEL), 2004 WL 74309, at *2

(S.D.N.Y. Jan. 15, 2004) (finding willful infringement an "issue[] of fact for trial"); <u>Travelers Indemnific'n Co. of Conn. v. Losco Group, Inc.</u>, 136 F. Supp. 2d 253, 256 (S.D.N.Y. 2001) (finding gross negligence "a question of fact for a jury"). College Partnership must, however, allege sufficient facts to support a finding of bad faith, willful misconduct, or gross negligence by Duncan.

Here, College Partnership alleges that Duncan "violated its covenant of good faith and fair dealing by taking deliberate action to harm College Partnership after it had secured College Partnership's partial performance and after Duncan[]'s refusal to perform left College Partnership in an untenable position." (9/9/05 Countercl. ¶ 34; 10/19/05 Countercl. ¶ 33).[6] College Partnership further alleges that Duncan "on a number of occasions threatened College Partnership, directly and through third parties, with financial harm including but not limited to forcing College Partnership into bankruptcy and 'taking College Partnership down.'" (6/10/05 Compl. ¶ 20; 9/9/05 Countercl. ¶ 19; 10/19/05 Countercl. ¶ 18). College Partnership argues that these allegations will support a finding that Duncan "willfully abandoned College Partnership once it had locked College Partnership into the bridge financing" and that Duncan's "failure to act was done in bad faith." (CP Opp. Mem. at 11).

---

[6]   This allegation is not, however, in the Colorado-filed complaint.

While College Partnership could be more specific in describing the types of harmful actions taken by Duncan, and will eventually have to provide evidence of this misconduct to prevail, it does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Accordingly, Duncan's motion to dismiss the breach of contract claim is denied.

**b.   CAMOFI and Bridges**

With respect to CAMOFI and Bridges, College Partnership has not sufficiently alleged the very first element of a breach of contract: the existence of an agreement between College Partnership and CAMOFI and Bridges. Neither CAMOFI nor Bridges were parties to the Banking Agreement at the heart of College Partnership's contract claim. College Partnership contends, however, that they may nonetheless be held liable for the breach as Duncan's alter egos. I hold that they may not.

Under New York law, one corporation is a mere alter ego when it "has been so dominated by . . . another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 703 (2d Cir. 1990) (internal citation and quotation marks omitted) (emphasis added). Then the dominating corporation will be held liable for the actions of its subsidiary. Tecnoclima,

S.p.A. v. PJC Group of N.Y., Inc., No. 89 Civ. 4437 (CSH), 1991 WL 33357, at *8 (S.D.N.Y. Feb. 27, 1991). Alter ego cases typically involve the determination of "which corporate parties may be cast in damages for the breach" of a contract. Id. In this analysis, control is the key. Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138 (2d Cir. 1991). Courts will only "pierce the corporate veil" where there has been "complete control by the dominating party that leads to a wrong against third parties." Id..

Here, College Partnership seeks to hold CAMOFI and Bridges responsible for Duncan's actions under an alter ego theory, alleging the following: "The exact corporate relationship and affiliations between . . . [CAMOFI, Duncan, and Bridges] is not known to College Partnership; however, based on information and belief, [CAMOFI and Bridges] are so interrelated and closely affiliated to Duncan [ ] that for the purposes of this action, they are alter egos of each other and act as a single entity." (9/9/05 Countercl. ¶ 5; 10/19/05 Countercl. ¶ 5). Even construing the facts in the light most favorable to it, College Partnership fails to state a viable alter ego relationship, whereby Duncan is a mere alter ego of CAMOFI and Bridges such that CAMOFI and Bridges should be liable for Duncan's actions. See Clapp v. Greene, 743 F. Supp. 273, 276 (S.D.N.Y. 1990) (citations omitted) (finding that "conclusory allegations merely stating the general legal conclusions necessary to prevail on the

merits and which are unsupported by facts" need not be "taken as true.").

To proceed against CAMOFI or Bridges for Duncan's misconduct, College Partnership must allege that Duncan was completely dominated by CAMOFI or Bridges -- a "mere instrumentality" of those two entities with "no separate will of its own" -- with respect to its performance on the Banking Agreement. Tecnoclima, 1991 WL 33357, at *8. College Partnership's allegations fall far short of this. College Partnership has also failed to allege any facts tending to show that CAMOFI and Bridges controlled Duncan and used their domination of Duncan to commit a fraud. See Spectra Secs. Software, Inc. v. MuniBEX.com, Inc., 763 N.Y.S.2d 313, 314-15 (3d Dep't 2003). Thus, College Partnership fails to adequately allege that Duncan was an alter ego of CAMOFI and Bridges.

At first glance, this conclusion may appear to be inconsistent with my denial above of summary judgment on the alter ego question. This claim, however, is somewhat different, and there is no inconsistency. While a reasonable jury could find that Duncan dominated CAMOFI and Bridges such that they were mere instrumentalities of Duncan, College Partnership fails to adequately plead that the opposite is true -- that CAMOFI and Bridges have so dominated Duncan that they should be held liable for Duncan's actions. In fact, such a conclusion would defy common sense.

As neither CAMOFI nor Bridges are party to the Banking
Agreement and College Partnership has alleged no basis for
holding either one liable as alter egos for Duncan's alleged
breach of contract, the breach of contract counterclaims are
dismissed.

### 2. **Declaratory Judgment**

Next, College Partnership seeks a declaratory judgment
that Duncan has failed to meet its obligations under the Banking
Agreement.  (6/10/05 Compl. ¶ 25; 9/9/05 Countercl. ¶ 30;
10/19/05 Countercl. ¶ 29).  It is within the broad discretion of
the trial court whether to exercise declaratory jurisdiction.
Muller v. Olin Mathieson Chem. Corp., 404 F.2d 501, 505 (2d Cir.
1968).  The court must consider whether a declaratory judgment
will (1) "serve a useful purpose in clarifying and settling the
legal relations in issue;" or (2) "afford relief from the
uncertainty, insecurity, and controversy giving rise to the
proceeding."  Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734,
737 (2d Cir. 1992) (citation omitted).  Because the declaratory
judgment College Partnership seeks is duplicative of the
adjudication of its breach of contract claim, it serves neither
of these two objectives.  See Fisher-Price, Inc. v. Well-Made Toy
Mfg. Corp., No. 92-CV-0832E(M), 1993 WL 379589, at *2 (W.D.N.Y.
Sept. 21, 1993) (finding declaratory relief served "no useful
purpose" where relief sought was available "via a trial on the
merits").

Under the first factor, a declaratory judgment would

not further clarify legal relations among the parties; the determination sought -- that Duncan breached the Banking Agreement -- will already be addressed in the breach of contract claim.  Under the second factor, declaratory relief is also unnecessary as no cloud of uncertainty hangs over College Partnership.  The parties have already chosen to pursue their coercive remedies and College Partnership has not been left awaiting the initiation of legal proceedings while damages accrue.  See Great Am. Ins. Co. v. Houston Gen. Ins. Co., 735 F. Supp. 581, 585 (S.D.N.Y. 1990) ("The intent [of a declaratory judgment] is to allow a party to be free from the whim of its opponent in deciding when to resolve the legal dispute between them."); see also Gotham Ins. Co. v. Plant Maint. Serv. Co., No. 94 Civ. 1461 (WK), 1994 WL 714302, at *3 (S.D.N.Y. Dec. 22, 1994) (citation omitted) (finding declaratory judgment inappropriate where a party has already invoked its right to a coercive remedy).  The question of the parties' obligations to one another will all be resolved in the context of these claims.  See Nat'l Union Fire Ins. Co. of Pittsburg v. Int'l Wire Group, Inc., No. 02 Civ. 10338 (SAS) 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003).

Additionally, an examination of "the litigation situation as whole" also supports dismissal of the instant declaratory judgment claim.  Great Am. Ins. Co., 735 F. Supp. at 585.  College Partnership filed the first action for declaratory judgment in Colorado state court, just days before full payment

on the Notes became due.  Knowing of its impending default on the $250,000 loans, College Partnership appears to have filed the Colorado action to gain a procedural advantage, thereby preempting the Note holders' choice of forum as the natural plaintiffs in an action to recover on the Notes.  See N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, No. 04 Civ. 9949 (KMK), 2005 WL 646350, at *17 (S.D.N.Y. Mar. 21, 2005) ("[C]ourts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum.").  While declaratory relief is sought against Duncan, the complaint was also filed against the natural plaintiffs on the Notes -- CAMOFI and Bridges; such apparent forum-shopping also weighs in favor of dismissing the claim.

Accordingly, the motions to dismiss the claim for declaratory judgment are granted.

### 3.   Rescission and/or Reformation Based on Fraud

As set forth above, to prevail on a claim of fraudulent inducement under New York law, a plaintiff must demonstrate: (1) a misrepresentation of an existing material fact; (2) made with knowledge of its falsity; and (3) with an intent to defraud; (4) that induces reasonable reliance; and (5) damages the plaintiff . Stumm v. Drive Entm't, Inc., No. 00 Civ. 4676 (DC), 2002 WL 5589,

at *7 (S.D.N.Y. Jan. 2, 2002) (citations omitted).[7]
Misrepresentations must be of present fact -- not future intent.
<u>Stewart v. Jackson & Nash</u>, 976 F.2d 86, 89 (2d Cir. 1992)
(citation omitted).  A mere unfulfilled promise cannot form the
basis of fraud unless it was "made with the preconceived and
undisclosed intention that [it] will not be performed."  <u>Von
Hoffmann v. Prudential Ins. Co. of Am.</u>, 202 F. Supp. 2d 252, 259
(S.D.N.Y. 2002) (quotations omitted); <u>see also</u> <u>Sabo v. Delman</u>, 3
N.Y.2d 155, 162 (1957) ("[A] contractual promise made with the
undisclosed intention not to perform it constitutes fraud.").

          Duncan, CAMOFI, and Bridges argue the fraud allegation
should be dismissed for failure to state a claim under Rule
12(b)(6) and failure to plead fraud with particularity under Rule
9(b).  I address each argument in turn.

     **a.   <u>Failure to State a Claim</u>**

          College Partnership pleads, without specificity, that
it was fraudulently induced to enter into the Banking Agreement,
issue stock, and execute the $250,000 Notes based on Duncan's
misrepresentations of services that it would perform under the
Banking Agreement.  (9/9/05 Countercl. ¶¶ 20-25; 10/19/05

---

          [7]     College Partnership's cause of action for "rescission
and/or reformation" is actually one for fraudulent inducement,
with the relief sought being rescission or reformation of, <u>inter
alia</u>, the Banking Agreement and Notes.  (9/9/05 Countercl. ¶¶ 20-
25; 10/19/05 Countercl. ¶¶ 19-24).  Judge Matsch dismissed this
claim for failure to plead fraud with particularity, but College
Partnership makes the same allegations, with minor alterations,
in its Third Party Complaints against Duncan and thus I evaluate
the pleadings as they appear in the Third Party Complaints.

Countercl. ¶¶ 19-24).[8]  It states that "Duncan [ ] misrepresented the services it would perform under the [Banking] Agreement," including that the "Notes would only be temporary financing that would be replaced by permanent financing."  (9/9/05 Countercl. ¶¶ 21-22; 10/19/05 Countercl. ¶¶ 20-21).

This is essentially a claim for breach of contract, which, as discussed above, generally cannot give rise to a claim of fraud.  Stumm, 2002 WL 5589, at *7 (citation omitted) ("Where the fraudulent conduct alleged amounts only to the defendant's false representation that it was adhering to the terms of the contract, the claim for fraud must be dismissed . . . .").  To distinguish a fraud claim from a breach of contract claim, the alleged misconduct must (1) breach a legal duty independent of the contract; or (2) consist of a fraudulent misrepresentation "collateral or extraneous to the contract"; or (3) cause "special damages" that cannot be recovered as contract damages.  Vtech Holdings Ltd. v. Lucent Techs. Inc., 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).  College Partnership's allegations do not fall under any of the exceptions and are thus insufficient to support a claim of fraud.

Additionally, College Partnership inadequately pleads the elements of a fraudulent inducement claim: it fails to plead

---

[8]     Judge Matsch dismissed this claim for failure to plead fraud with particularity, but College Partnership makes the same allegations, with minor alterations, in its Third Party Complaints against Duncan and thus I evaluate the pleadings as they appear in the Third Party Complaints.

that Duncan had knowledge of the falsity of its statements or a preconceived notion that it would not perform under the contract; and College Partnership also fails to plead misrepresentation of an existing fact.  Cf. Stewart, 976 F.2d at 89; Von Hoffmann, 202 F. Supp. 2d at 259.

Accordingly, College Partnership's fraudulent inducement claim for rescission and/or reformation of the Banking Agreement must be dismissed.

### b.  Rule 9(b)

College Partnership also fails to meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that fraud be pled with particularity.  The plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 187 (2d Cir. 2004) (citation and quotation marks omitted).

College Partnership utterly fails this requirement. College Partnership makes only the most general of allegations that Duncan misrepresented the services it would perform.  It fails to allege any specific fraudulent statements or the "time place, speaker, and content" of the statements.  DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).

For all the above reasons, the claim for rescission and/or reformation based on fraudulent inducement is dismissed.

### 4.   Contribution and/or Indemnification

Finally, College Partnership brings a claim for common law indemnification from Duncan "for any damages that may be recovered by" CAMOFI and Bridges "as a result of the wrongful conduct of . . . Duncan" (9/9/05 Countercl. ¶¶ 37-38; 10/19/05 Countercl. ¶ 36-37), and pleads in the alternative that College Partnership is entitled to contribution from Duncan "to the extent that any portion of a judgment . . . against College Partnership resulted from [Duncan's] wrongful conduct." (9/9/05 Countercl. ¶ 39; 10/19/05 Countercl. ¶ 38).[9]

A party may be entitled to common law indemnification where it has committed no wrong but has nonetheless been held vicariously liable by virtue of its legal relationship to the actual wrongdoer. See Glaser v. M. Fortunoff of Westbury Corp., 71 N.Y.2d 643, 646 (1988); Edge Mgmt. Consulting, Inc. v. Blank, 807 N.Y.S.2d 353 (1st Dep't 2006). Thus, where one is completely without fault, the entire loss will be shifted to the culpable party to prevent an unjust or unsatisfactory result. Glaser, 71 N.Y.2d at 646; Rosado v. Proctor & Schwartz, Inc., 66 N.Y.2d 21, 23-24 (1985). On the other hand, where a party is even partly at fault for the loss, contribution from other culpable parties on a pro rata basis is the only available remedy. Glaser, 71 N.Y.2d

---

[9]    This claim was not a part of the Colorado-filed complaint, and College Partnership does not seek to assert this claim against CAMOFI or Bridges. (CP Opp. Mem. at 13).

at 646; see also Ins. Co. of N. Am. v. Historic Cohoes II,  879
F. Supp. 222, 228 (N.D.N.Y. 1995).

Here, College Partnership's liability stems from its
own acts and omissions in purportedly failing to meet its
obligations on the Notes.  It was not acting vicariously for
Duncan when it executed the Notes.  See Consol. Rail Corp. v.
Hunts Point Terminal Produce Coop. Ass'n, 783 N.Y.S.2d 30, 31
(1st Dep't 2004); see also Jordan v. Madison Leasing Co., 596 F.
Supp. 707, 709 (S.D.N.Y. 1984).  Hence, College Partnership is
not entitled to indemnification from Duncan.  Rather, it may only
seek contribution.

The contribution claim, however, also fails, for under
New York law there can be no contribution among two parties for
purely economic loss that flows from a breach of contract.  Bd.
of Ed. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw &
Folley, 71 N.Y.2d 21, 24 (1987).  The underlying action here is a
pure contract action seeking only economic damages.  College
Partnership seeks contribution to any recovery by CAMOFI and
Bridges for the alleged breach of the two Notes.  Hence, College
Partnership cannot seek contribution from Duncan.

College Partnership contends that "[t]o the extent [it]
has sufficiently pled . . . torts [of fraud, negligence, and
breaches of duty]" against Duncan, "it has stated a cause of
action for contribution."  (CP Opp. Mem. at 12).  The cases
College Partnership cite for support both involve underlying
actions that sound in the law of torts -- not contracts -- and

thus present different scenarios than the situation here.  <u>See</u>
<u>Jordan</u>, 596 F. Supp. 707 (underlying claims of negligence, breach
of fiduciary duties, and fraud under section 10(b) of federal
securities laws); <u>Von Hundertmark v. Boston Prof'l Hockey Ass'n</u>,
No. CV-93-1369 (CPS), 1996 WL 118538 (E.D.N.Y. Mar. 7, 1996)
(underlying action for negligent supervision).  Drawing all
factual inferences in its favor, I conclude that College
Partnership's allegations of fraud against Duncan do not
transform the underlying actions against College Partnership for
recovery on promissory notes into tort actions.

 Accordingly, College Partnership's claim for
contribution and/or indemnification against Duncan is dismissed.

<u>**CONCLUSION**</u>

 For the reasons stated above, CAMOFI's and Bridges's
motions for summary judgment on the Notes and motions to dismiss
College Partnership's claims are granted.  As College Partnership
has had three opportunities -- in three separate actions -- to
plead its claims against CAMOFI and Bridges, it will not be given
another opportunity to replead those claims.  Accordingly, for
the foregoing reasons, the claims against CAMOFI and Bridges are
dismissed, with prejudice.  Duncan's motion to dismiss is granted
in part and denied in part; all claims against Duncan, except
that for breach of contract, are also dismissed, with prejudice,
for College Partnership has also had sufficient opportunity to
plead its claims against Duncan.  Counsel for the parties shall
appear for a conference on October 27, 2006, at 11 a.m. to

discuss damages and consolidation of the actions for further proceedings.

      SO ORDERED.

Dated:    New York, New York
          September 28, 2006

                          DENNY CHIN
                          United States District Judge

- 44 -

## APPEARANCES:

For College Partnership, Inc.:

        CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
           By:  Turner P. Smith, Esq.
        101 Park Avenue
        New York, New York  10178


For Duncan Capital LLC and Bridges & Pipes LLC:

        SICHENZIA ROSS FRIEDMAN FERENCE LLP
           By:  Sameer Rastogi, Esq.
               Christopher P. Milazzo, Esq.
        1065 Avenue of the Americas, 21st Floor
        New York, New York  10018

For CAMOFI Master LDC:

        EATON & VAN WINKLE LLP
           By:  Charles K. Fewell, Jr.
                Alexander Tripp, Esq.
        3 Park Avenue
        New York, New York  10016